J9C6MENC

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  EILEEN MENDEZ,

4              Plaintiff,

5         v.                  19 CV 2945(DAB)

6  NEW YORK CITY DEPARTMENT OF
    EDUCATION,
7
              Defendant.
8
  ------------------------------x
9                           New York, N.Y.
                           September 12, 2019
10                         10:40 a.m.

11  Before:

12                HON. DEBORAH A. BATTS,

13                          District Judge

14                  APPEARANCES

15  KARL ASHANTI, ESQ.
       Attorney for Plaintiff
16
  DAVID S. THAYER, ESQ.
17      Attorney for Defendant

18

19

20

21

22

23

24

25

J9C6MENC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, starting with plaintiffs' counsel.

4          MR. ASHANTI:  Good morning, your Honor.  Karl Ashanti

5     from the Brain Injury Rights Group appearing on behalf of the

6     plaintiffs.

7          THE COURT:  Good morning, Mr. Ashanti.

8          The way we work in this courtroom is remain seated

9     when you talk to me and use the microphone.

10          MR. ASHANTI:  Certainly.

11          THE COURT:  On behalf of the New York City Department

12     of Education, we have Mr. David Thayer.

13          MR. THAYER:  Yes, your Honor.  That's correct.

14          THE COURT:  Good morning to both of you.

15          Now, this is somewhat of a hybrid procedure.

16          Bear with me for one second.

17          (Pause)

18          THE COURT:  As I started to say this is somewhat of a

19     hybrid proceeding.  The parties by letter suggest that they are

20     at the stage where they wish to make a motion for summary

21     judgment.

22          Is that correct?

23          MR. THAYER:  Yes, your Honor.

24          MR. ASHANTI:  Yes, your Honor.

25          THE COURT:  So both parties.  So you want to make

J9C6MENC

1    cross-motions for summary judgment?

2              MR. ASHANTI:  That's correct, your Honor.

3              THE COURT:  You have had discovery, or you are

4    limiting it to the administrative record?

5              MR. ASHANTI:  It's the administrative record, your

6    Honor.  There are no disputed issues of material fact.

7              MR. THAYER:  We're planning to moving solely on the

8    record and assume that plaintiffs are doing the same.

9              THE COURT:  All right.

10             MR. THAYER:  Your Honor, there is one new piece of

11   information that I think perhaps would be best to inform the

12   Court of.

13             As your Honor is aware this is an IDEA appeal and it

14   deals with question of pendency.  Meanwhile, at the IHO level

15   the administrative proceeding has continued.  And as of

16   August 26th a final findings of fact and decision was issued by

17   the IHO in the underlying proceeding that was averse to the

18   Department of Education.

19             The Department's time to appeal that final decision --

20   it extends 40 days ultimately from the date of that decision,

21   but DOE is required to file a notice of intent to seek review

22   by next Friday.  If DOE does seek an appeal or does not seek an

23   appeal of that decision, it seems that that would likely have a

24   significant impact on the viability of this case.  I am not in

25   a position today to say whether or not the Department of

J9C6MENC

1  Education intends to take an appeal to the SRO.

2          THE COURT:  Fill me in a little bit on the procedural

3  history of this case.  It went to an SRO; right?

4          MR. THAYER:  That's correct.

5          THE COURT:  Was it sent back here?  Was it sent to IHO

6  by the SRO?

7          MR. THAYER:  No.  The IHO initially made a decision

8  favorable to the parents, which that the Department of

9  Education essentially took an interlocutory appeal of to the

10  SRO.  The SRO ruled in our favor and then plaintiffs have

11  brought that decision for review in this court.  But because

12  that was -- I am paraphrasing here by referring to it as an

13  interlocutory appeal -- in the nature of that appeal the

14  underlying proceedings before the IHO continued to the merits

15  and we received now a decision on the merits of the case at the

16  IHO level.

17          MR. ASHANTI:  Your Honor, may I?

18          THE COURT:  Please.

19          MR. ASHANTI:  So there are differing opinions of the

20  plaintiffs and of the Department regarding the effect of the

21  decision issued on August 26th because it did not concern

22  pendency explicitly.  It was the underlying resolution and

23  adjudication of the underlying administrative due process

24  complaint that the plaintiffs had filed.

25          THE COURT:  Now that was before me also; right?

1          MR. ASHANTI:  No, it was not.  So that is why it is

2     separate.  So that underlying due process complaint gets

3     adjudicated at the administrative level and results in a

4     finding of fact and decision, which is separate and apart from

5     the issue of pendency before your Honor.

6          Financially there are ramifications for the finding of

7     fact and decision that was issue on August 26th, but in terms

8     of the rights of the pendency rights of the students, they have

9     not been resolved via decision.  So we have differing opinions

10    as to that.  So regardless of whether or not the district takes

11    an appeal, dispositive motion practice will be necessary.  So

12    the parties we discussed the differing scenarios of whether the

13    Department takes an appeal or not, and we're in agreement that

14    there will be a necessity of dispositive motion practice in

15    either case.  Except the substance of the Department's motion

16    would be different obviously between whether or not -- if it

17    did take an appeal, their motion would be different than if

18    they didn't take an appeal.  Either way they will be moving for

19    summary judgment and so would the plaintiffs.

20         The timing might be affected by -- we discussed

21    perhaps informing your Honor through a joint status report on

22    the 25th whether or not the Department is taking an appeal and

23    then setting forth a proposed briefing schedule, having

24    discussed it at that point; but in either case dispositive

25    motion practice will be necessary.

J9C6MENC

1          THE COURT:  I had intended to try to clarify some

2     issues for me and since I have you here, I might as well

3     continue to try do that.  Let me start first with the City.

4          Mr. Thayer, was there 2018-2019 plan prepared for the

5     plaintiff?

6          MR. THAYER:  An IEP, your Honor?

7          THE COURT:  Yes.

8          MR. THAYER:  There was.

9          THE COURT:  When was that prepared?

10          MR. THAYER:  I am not sure of the exact date, your

11     Honor, but it was rejected by the parents.

12          THE COURT:  Okay.  Was this before or after the

13     pendency issue came up?

14          MR. THAYER:  Pendency is raised in the due process

15     complaint.  So it was -- the pendency issue was raised at the

16     same time that plaintiffs attacked the plan offered by the

17     school district.  It was raised in the same document, the due

18     process complaint.

19          THE COURT:  Mr. Ashanti, would you tell me why the

20     child plaintiff was moved to the iBrain from iHope?

21          MR. ASHANTI:  Yes, your Honor.  It is my understanding

22     that the initial iteration of iHope, which came first was --

23     the parents were very happy with.  They were happy with the --

24     everything about it -- the educational program, the staff, the

25     administration.  However, during the course of the '17-'18

J9C6MENC

1    school year, there were changes that were made -- fundamental

2    changes and the original -- essentially the original founders

3    and some of the administration was ousted.  There was a split.

4    The nature of the educational program and what was offered at

5    iHope significantly changed as a result.

6            It was initially, you know, a program that was offered

7    to students with traumatic brain injuries solely to concentrate

8    on their needs and the needs of their families.  After the

9    change in iHope, there was an organization called YAI that came

10   in and took over.  Although, they kept the iHope name.  So now

11   for the '18-'19 school year, and I believe still today, there

12   are students of wide-ranging disabilities in the program.  The

13   staff has changed.  The original -- the administration has

14   fundamentally changed.

15           So the parents looking at this didn't want to go down

16   that road.  So it maintains the same name, but it is a

17   fundamentally different school today for the '18-'19 school

18   today.  What happened was because of the split, iBrain was

19   created.  IBrain was created in the image of the original iHope

20   and so it gave the parents an opportunity to continue the

21   education of the child in the way that they had originally

22   intended through iBrain.

23           THE COURT:  Was the Department of Education made aware

24   of this?

25           MR. ASHANTI:  Not formally.  I don't believe there is

J9C6MENC

1    any requirement for iHope to have informed -- I could be wrong,

2    but I don't believe there is any requirement to inform--

3               THE COURT:  I am talking about the plaintiffs.

4               MR. ASHANTI:  They made the Department aware through

5    their -- what is called a 10-day notice.  So before the '18-'19

6    school year, they -- which doesn't directly relate to iHope at

7    all actually because it was a reaction to the IEP that the

8    Department created for the student that Mr. Thayer had

9    mentioned.  So the parents received the Department's IEP for

10   the student for the '18-'19 school year and found there were

11   fundamental deficiencies in that and then objected through the

12   due process complaint by which they also asked for pendency.

13              The import of all of that really is that just

14   factually from the educational program that was given to the

15   students for the '18-'19 school year was purposely designed to

16   be a replica of the educational program that the student

17   received for the '17-'18 school year.

18              THE COURT:  That was in the IEP; is that what you are

19   saying?

20              MR. ASHANTI:  Well, the IEP is a different issue.  So

21   the IEP is the proceeding concerning whether -- the fundamental

22   issue is whether the Department has offered the students a

23   FAPE, free and public education, through that IEP and the

24   placement that would go associated with that.  That is for a

25   public school placement.  So that is why it is really separate

J9C6MENC

1    and apart from the issue of pendency because the student was

2    enrolled in a nonpublic school for the '17-'18 school year.  So

3    the educational program that the student received was strictly

4    a nonpublic school educational program.  In the '18-'19 school

5    year, the student similarly received a nonpublic school

6    educational program that was designed to be a replica of the

7    '17-'18 school year educational program.  That is the basis of

8    pendency.

9           The plaintiffs claim that the educational program a

10   student received in the '18-'19 school year is a continuation

11   substantially similar to the educational program the student

12   received in the '17-'18 school year, which does not in any way

13   touch the merits because pendency is resolved separate and

14   apart from the merits of the underlying dispute with the DOE

15   regarding the IEP.

16          THE COURT:  I understand that, but the question is in

17   my mind, and this obviously will be resolved in your papers or

18   can be resolved hopefully from the papers that you will file,

19   is had the plaintiff remained at iHope, would there be any

20   issue in terms of continuing her there?

21          MR. ASHANTI:  Regarding pendency, your Honor?

22          THE COURT:  No.  Regarding whether or not the

23   Department of Education would have challenged that having paid

24   for the first year at iHope.

25          MR. THAYER:  We would not have had an issue with

J9C6MENC

1    continuing funding for the child at iHope under the pendency

2    rubric.  Essentially that goes to the heart of our dispute.  We

3    believe that once the parent prevails on the merits with

4    regards to a particular educational placement --

5            THE COURT:  Which they did in 2017 and 2018?

6            MR. THAYER:  Correct.

7            -- they have secured essentially by operation of law

8    the school district's agreement to that placement.  In other

9    words, it has been sort of blessed with the imprimatur of the

10   school district's okay even if it was over their objection

11   originally.  There was litigation about it.  Once the parent

12   removed the child from that placement to another school at

13   which they had not secured a favorable decision through the

14   typical Burlington Carter process that they can't carry the

15   pendency with them because otherwise then a parent could shop

16   around for private schools all on the public school district's

17   dime without really ever securing a sort of baseline

18   administrative decision okaying that school.

19           MR. ASHANTI:  Of course it is plaintiffs' position

20   that the Burlington Carter test is with respect to the merits

21   of any underlying due process complaint filed, which again is

22   separate -- the case law is very clear separate and apart from

23   pendency.  So Mr. Thayer is correct it is the heart of the

24   dispute because it's -- from the district's perspective, it

25   should have make no difference really, right.

J9C6MENC

1          THE COURT:  Wait.  Wait.  Wait.

2          What do you mean from the district's perspective it

3  should make no difference?

4          MR. ASHANTI:  Because you have funding for an

5  education at one nonpublic school and a claim for funding for

6  education at another nonpublic school.  So either way there is

7  public funds being outlaid for an education at a nonpublic

8  school.

9          THE COURT:  Isn't there an obligation on the part of

10  the Department of the Education to make sure that the program

11  that that child has is sufficient for them?

12          MR. ASHANTI:  Absolutely.  That is done by scrutiny of

13  the educational program the student is receiving.  Meaning, is

14  this essentially the same -- substantially similarity test.  Is

15  it essentially the same as the educational program the student

16  previously received.  If it is not, if the plaintiffs in this

17  case or any other case fail that test and if there are

18  fundamental differences between the education the student is

19  receiving currently and the educational the student previously

20  received, then there is no pendency.  We fully acknowledge

21  that.  However, as I pointed out, your Honor, it was pursuant

22  to the educational program the student received --

23          THE COURT:  Slow down.

24          MR. ASHANTI:  The educational program the student

25  received for the '18-'19 school year was specifically designed

J9C6MENC

1    to be a replica of the educational program the student had

2    received in the '17-18 school year.  So the case law is clear.

3    The Second Circuit's case law is clear that it is an

4    educational program.  The substance of the educational program

5    that defines the placement for purposes of pendency.  So it is

6    the educational program that is the same, and that is what

7    we're claiming here.

8              It is not a matter of shopping around for schools

9    because if you go to any school if the educational program the

10   student is receiving is different, you don't get pendency.

11             THE COURT:  Well, the timing of this is kind of a

12   puzzle to me.  I know that the child went to the school 12

13   months a year.

14             MR. ASHANTI:  Yes.

15             THE COURT:  It was year-around.  Under that program

16   doesn't the school year start July 1st?

17             MR. ASHANTI:  It starts the 1st --

18             MR. THAYER:  In early July.

19             MR. ASHANTI:  Yes.  It is always early July.  Because

20   of the July 4th holiday, typically it will be the first or

21   second week of July.

22             THE COURT:  Before seeking the pendency continuation

23   of funds, is there no opportunity for the Department of

24   Education under these circumstances since it is a different

25   school to see that it is substantially similar to the program

J9C6MENC

1    that was paid for in 2017-2018?

2            MR. ASHANTI:  Absolutely, your Honor.  We provided all

3    that documentation to the Department, but the Department's

4    position is even if they are exactly the same -- the

5    educational program is exactly the same because there is a

6    change of location, you don't get pendency.  That is the

7    Department's position.

8            THE COURT:  He is shaking his head.  Let me hear what

9    his position is and then you can respond.

10           MR. THAYER:  The Department's position is that the

11   removal of a child from a sanctioned placement at any school --

12   the removal of a child from that placement constitutes a change

13   in placement and you therefore cannot carry pendency funding.

14   It's not about the -- the Department's position is that we

15   don't even get to substantial similarity in these

16   circumstances.  Substantial similarity comes out of school

17   district's necessary to be able to, say, take a child from one

18   school location and put them in another one because of

19   staffing, budgetary constraints.  Historically that prompted

20   the Department to be sued by parents who were saying, Keep our

21   kid at that school location, and substantially similarity was

22   developed as a response to give the school district some wiggle

23   room in that area.

24           In those circumstances, the child's placement, the

25   educational program, is being administered within one single

J9C6MENC

1    school district.  That is a public school.  So they are both --

2    schools in that scenario are public schools.  Here, the parents

3    unilaterally took the parent -- took the child out of public

4    school into a private school got -- over the DOE's objection --

5    an okay for that private school and then the next year

6    essentially did that again.

7            So the Department's position is that we don't get to

8    substantial similarity in those circumstances.

9            MR. ASHANTI:  Right.  Again, it goes back to what I

10   said before.  Even if --

11           THE COURT:  Slow down.  Slow down.

12           MR. ASHANTI:  The position is even if it was

13   substantially similar, I understand the Department believes

14   that the Court shouldn't apply the substantial similarity test

15   here; but the point is factually the Department's position is

16   even if it is exactly the same educational program that the

17   student is not entitled to pendency because of the change of

18   location from one school to the other.  Again, we're talking

19   about one nonpublic school to another nonpublic school.

20           THE COURT:  Is that a distinction in the cases?

21           MR. ASHANTI:  It is not a distinction in the cases in

22   terms of the definition of educational placement.  The

23   operative term in pendency is the students then current

24   educational placement.  So then the issue becomes what does the

25   word placement in that phrase mean, and the courts have defined

J9C6MENC

1    it and the Second Circuit has defined it definitively and there

2    is no other definition that has been promulgated by the Second

3    Circuit.  It means the educational program that the student has

4    been given, not the bricks and mortars.

5              THE COURT:  I understand that argument, but I guess my

6    question here is:  Doesn't that put the Department of Education

7    at a Whack-a-Mole situation?  You say it is the same program

8    and you keep moving from one school to the other, location-wise

9    is that something that you understood is the responsibility of

10   the Department of Education?

11             MR. ASHANTI:  Well, here is the thing about that, your

12   Honor.  In terms of the Department and the application of the

13   Burlington-Carter test, they have that opportunity and that is

14   with the underlying due process complaint.  So the Department's

15   objection is, Well, we didn't have the opportunity to

16   scrutinize this school to see if it passes muster.  Well, they

17   do.  That's the ongoing -- well, actually now it has been

18   resolved in the parents' favor.  That is what we are seeing,

19   the underlying proceeding before the IHO, IHO John Farrigo, was

20   that, exactly that.  The Department's position was the school,

21   iBrain, is not an appropriate FAPE school location for the

22   student.  They lost; we won.  So the finding right now, unless

23   they appeal, is iBrain is appropriate for this student.  Again,

24   that is merits on the merits.

25             THE COURT:  I get that.

J9C6MENC

1          Continue.

2          MR. ASHANTI:  So my point there is the Department

3     absolutely has and has had the opportunity to scrutinize and

4     object to anything that they find -- that they found

5     inappropriate with respect to iBrain.  They have had that

6     opportunity.  It has been going on for the entire school year.

7     It actually concluded through the decision on August 26th,

8     which is technically after the '18-'19 school year.  So they

9     have had that opportunity and nothing that the parents have

10    done has foreclosed that opportunity.

11          Pendency on the other hand, though, is whether or not

12    there is -- the status quo as been maintained for the student

13    educationally while that underlying proceeding before the IHO

14    was going on.  It is the parents' position and the case law is

15    defined as the educational program, the substantive education

16    until program the student has received.  Because it is the

17    same, the student is entitled to pendency and it is simple as

18    that.  There are two separate processes with two seperate

19    objectives and two separate goals.

20          In terms of the idea moving from place to place to

21    place, that is not our facts.  Our facts are very specific.  I

22    am glad your Honor asked why the -- there was no transfer or

23    move or change.  Because the '18-'19 school -- excuse me, the

24    '17-'18 school year concluded and there was no obligation on

25    the part of the parents to -- you know, the enrollment contract

J9C6MENC

1    that the parents were under concluded at the end of the '17-'18

2    school year.  So the '18-'19 school was as a clean break.  At

3    the time that -- at the end of the '17-'18 school year, there

4    was no obligation or enrollment contract that required the

5    parents to reenroll the student at iHope.  They looked at the

6    situation.  They said, Well, this iBrain -- this new school

7    iBrain is essentially the old iHope that we know and love and

8    therefore we are going to enroll our child in the iBrain

9    program, which is essentially the old iHope program.

10          THE COURT:  Let me ask you this:  How did they know

11   that?  When did the iBrain program or school open?

12          MR. ASHANTI:  It opened in July of 2018.

13          MR. THAYER:  July 19th, 2019.

14          MR. ASHANTI:  '18.

15          MR. THAYER:  '18 was the first day of school and was

16   the same day that the parents instituted the due process

17   hearing.

18          MR. ASHANTI:  Right.

19          MR. THAYER:  So in terms of the Department of

20   Education having an opportunity to examine the school, the

21   first day -- when I say "the first day of school," I mean the

22   first day iBrain opened its doors ever and admitted students

23   was July 9, 2019.

24          MR. ASHANTI:  '18.

25          MR. THAYER:  Thank you.  '18.  That was the day that

J9C6MENC

1    this proceeding began.  I stand by my position that the move

2    severs pendency, but if we're going to talk about the

3    Department of Education having an opportunity to evaluate the

4    sufficiency or for that matter the comparability to iBrain to

5    iHope, there is nothing to look at on July 9th.  It was the

6    first day of school ever.  As a factual matter, the SRO in this

7    case determined that the schools weren't substantially similar.

8             So I think we have a disagreement about the legal

9    question of whether the pendency can move with the child from

10   iHope to iBrain.  And then there is the factual question that

11   is a more traditional IDEA case in that it requires the Court

12   to examine a factual determination by a state administrative

13   decision-maker for deference and so on and so forth.

14            The question of the portability of pendency is --

15            THE COURT:  I like that alliteration -- the

16   portability of pendency.

17            MR. THAYER:  That is the term that Judge Daniels used

18   in his decision Dupalindo v. the Department of Education.

19   That's why I used it.

20            MR. ASHANTI:  So of course with the definition of

21   placement being very clear by the Second Circuit that it means

22   educational program and the educational program is factually

23   being the same sent --

24            THE COURT:  But that's based on your assertion.  In

25   other words, independently the Department of Education has not

J9C6MENC

1    had an opportunity to look into whether the programs are

2    substantially similar because there was no program on July 8th.

3               MR. ASHANTI:  Correct, your Honor.  My point is since

4    that time they have had ample opportunity.  The pendency issue

5    gets resolved at the beginning of the school year.  The whole

6    idea is that it is to be resolved pending the resolution of an

7    underlying due process proceedings.  So very early on in the

8    school year we provided all the information that the Department

9    needed before there was any initial pendency decision.  All the

10   information the Department needed to say, Okay, well, they are

11   substantially similar.  Maybe or even perhaps identical but

12   substantially similar certainly and therefore they could have

13   the ability to not contest pendency at that time.  Again, that

14   is separate and apart from their believing that the iBrain is

15   appropriate for the student.  That was determined -- that was

16   adjudicated through the underlying due process proceedings.

17              So there was certainly no withholding of information

18   by the parents to the Department of all the documentation or

19   testimony that they would need to make the determination of

20   substantially similarity.  They have taken a different position

21   that it is not based upon that, that it is based upon the

22   school location changing and that that severs pendency; but

23   that is not supported by the Second Circuit.

24              MR. THAYER:  To the extent that we sort of hashed out

25   the question of substantial similarity at the administrative

J9C6MENC

1    level, we have prevailed before the SRO on that question.  That

2    is why I should say this Court should give deference to that

3    factual determination that requires educational expertise.  So

4    it is our position that we would prevail on their view of what

5    the law is.  Of course we think that the law is a little bit

6    different in fact and so we also believe, though, that we will

7    prevail under our theory that if you port pendency from one

8    place to another, you lose it essentially unless and until you

9    can prevail on a Burlington-Carter analysis with regards to the

10   placement program that is being offered at that school.

11            MR. ASHANTI:  Two things about that, your Honor.  So

12   the parents have prevailed on the very test that Mr. Thayer

13   mentions, the Burlington Carter test.  So now there is no issue

14   factually about whether this program at iBrain is appropriate

15   for the student.  It is.

16            MR. THAYER:  I--

17            THE COURT:  One at a time.

18            MR. ASHANTI:  So there's -- that's the situation.

19   They haven't prevailed on the issue of substantial similarity

20   factually because we have appealed.  So there is no unappealed

21   decision saying that the educational programs are not

22   substantially similar.  That is the whole reason we're here

23   today.  We appealed that decision by the SRO, which again is --

24   there is no requirement and certainly that the issue of

25   substantial similarity be adjudicated by either an IHO solely

J9C6MENC

1    or by SRO solely.

2            In fact, Judge McMahon had adjudicated the issue and

3    it has been done previously.  Judge Torres has adjudicated that

4    issue as well.  Because of the evaluation of the educational --

5    factually the evaluation of the educational programs students

6    have received in the past, specifically the '17-'18 school

7    year, in comparison to the substance of the educational program

8    the students have received in the '18-'19 school year.  So that

9    can and should be adjudicated by a court, your Honor.  That is

10   the whole purpose of having that protection under the IDEA of

11   being able to appeal to the district court.

12           Certainly that will be resolved in the papers if there

13   is any -- in terms of the law, we have differing opinions as to

14   the law, but I don't think when your Honor -- after your Honor

15   reviews what the Second Circuit has put forth that there will

16   be any dispute as to that.  It was an unequivocal definition of

17   what an educational placement means.  So the -- really the --

18   in essence the Department's position is that educational

19   placement as defined by the Second Circuit does not mean

20   educational program when it is the plaintiffs that are using

21   the term, which does not make any sense.  It is a definition.

22   So the definition of an apple doesn't change if you are at the

23   beach or in a courtroom or at a baseball game.  An apple is an

24   apple.  The Second Circuit has clearly defined what educational

25   placement means.

J9C6MENC

1          THE COURT:  I don't mean to cut you off, Mr. Ashanti,

2     but in terms of the placement issue, has that been determined

3     by the Second Circuit when a transfer from one school to

4     another school has occurred?  There is no question in my mind

5     that if they stayed at the same school, this wouldn't be an

6     issue.  So the question I am having is is there a Second

7     Circuit case that is addresses when you take the child out of

8     one bricks and mortar and take them to another bricks and

9     mortar if the program is the same, then that bridges pendency?

10         MR. ASHANTI:  That's a very good question, your Honor.

11    There are actually three cases that are pending appeal on that

12    issue.

13         MR. THAYER:  I think there are four or five.  I think

14    we have four or five appeals right now.

15         MR. ASHANTI:  From our perspective I think one or two

16    of them are different for varying reasons.  The point is there

17    are appeals by both the parents of students of iBrain and the

18    Department that are pending in the Second Circuit.

19         MR. THAYER:  I believe the first appeal that is on for

20    argument in October is a case that all three of us are on as a

21    matter of fact.  Ms. Uto against New York City Department of

22    Education.  That is going on for oral argument in October.  I

23    believe there are three additional cases including the

24    appeal -- the interlocutory appeal from this case that will be

25    heard together but that are not consolidated in the Second

J9C6MENC

1   Circuit.  Briefing starts in late October for that.  Maybe

2   briefing has begun, but the Department's brief is due in late

3   October.

4          With respect to your Honor's question about the

5   educational placement and moving from bricks and mortar to

6   another bricks and mortar, there are cases that talk about

7   substantially similarity or approach those words but don't

8   explicitly use them, but they all deal with just public school

9   district moving a child from one school location to another

10  based on budgetary, staffing.

11         MR. ASHANTI:  They find that the application of the

12  substantially similarity test is how you determine whether or

13  not that is a proper transfer.  So it is the Department's

14  position that substantially similarity test applies in that

15  context but not here.  It is our position that it applies in

16  both.

17         THE COURT:  Let me ask you, Mr. Thayer, are you saying

18  it matters who moved the person, the student, for the pendency

19  issue not to be an issue?

20         MR. THAYER:  It's not who, your Honor.  It is in the

21  cases that I am referring to, the child's placement is a public

22  placement.  When the parents who have previously unilaterally

23  removed their child to a private school win on Burlington

24  Carter as I mentioned earlier, that is unilateral placement by

25  operation of law.  The Department's position sort of becomes

J9C6MENC

1    the public placement.

2         MR. ASHANTI:  That's what has happened here, your

3    Honor.

4         MR. THAYER:  It is our position that they have

5    essentially now re-unilaterally moved their child from a public

6    placement to a private placement.

7         THE COURT:  This is beginning to sound like how many

8    angels dance on the head of a pin, but since this is actively

9    being considered at least as to the constitutional aspect by

10   the Circuit, because that is not before me and you are only

11   before me in this case for the pendency, I don't need

12   necessarily on that question to wait to see what the circuit

13   does unless one of the cases that is in the Circuit does deal

14   with the application of pendency.

15        MR. THAYER:  I think all of them do frankly.  They

16   involve the question of whether or not a parent can take

17   pendency with them when they move their child from one private

18   school to another private school.

19        MR. ASHANTI:  It's our position is different for

20   varying reasons and that is neither here nor there.  In terms

21   of the issue of the adjudication of pendency before your Honor,

22   pendency was intended to be the immediate right.  So the

23   immediate procedural right, which is why with pendency comes

24   with what the Second Circuit has called an automatic

25   preliminary injunction.  That is the VD v. Amback case, which

J9C6MENC

1    is in the Second Circuit.  We're here now on September 12th of

2    2019 concerning an issue of pendency that was originally

3    brought before the administrative level on July 9th, 2018.  So

4    of course litigation is not --

5         THE COURT:  Speedy.

6         MR. ASHANTI:  -- speedy.  The point being it is our

7    position that given the nature of the right that is being

8    claimed that this matter should certainly proceed and it is

9    perceived in other matters as well.

10        MR. THAYER:  This is coming back to the first thing

11   that I said with regards to this August 26th, 2019 findings of

12   fact and decision, if DOE does not appeal that decision,

13   parents will be retroactively reimbursed for the school year.

14   So they will receive the money at issue in this case

15   retroactively rather than the sort of contemporaneously or

16   prospective payments of pendency, which is why I raised it and

17   suggested that it might --

18        THE COURT:  We should wait?

19        MR. THAYER:  Precisely.

20        THE COURT:  Mr. Ashanti.

21        MR. ASHANTI:  Your Honor, the only reason that we are

22   agreeing to wait is so that the issue of whether or not the DOE

23   has -- the appeal has been resolved, which is eight days from

24   now is their deadline to admit that decision and act upon it.

25        In terms of the right to pendency, it has been -- the

J9C6MENC

1   courts have established that pendency is -- the issuance of

2   funding through pendency is not a money judgment.  The courts

3   have found that.  So that means the right regarding pendency is

4   not just a financial right.  It is a statutorily guaranteed

5   right.  It is a procedural right that requires vindication

6   whether irregardless of -- regardless of the financial aspect

7   of it.  So that's why I say whether or not the Department

8   appeals, the Department would then move forward with

9   dispositive motion practice and so will the plaintiffs.

10             MR. THAYER:  We disagree.

11             THE COURT:  Well, I am not sure.  In terms of the

12   pendency if they don't appeal, then the pendency will start;

13   right?

14             MR. THAYER:  For the 2019-2020 school year, yes.

15             THE COURT:  Not for this year?

16             MR. THAYER:  This school year is the 2019 to 2020

17   school year so, yes, your Honor.  The answer is yes.  If we do

18   not appeal, then presumably -- I will have to talk to my client

19   at length about this, but it is my impression that the parents

20   would be likely entitled to pendency for this ongoing school

21   year.

22             MR. ASHANTI:  So regarding the '19-'20 school year it

23   is the same IHO who presided over the '18-'19 claim and the IHO

24   has recently issued a decision awarding pendency on the basis

25   of substantial similarity of educational program the student is

J9C6MENC

1    currently receiving for '19-'20 school year to the last agreed

2    upon placement.

3            THE COURT:  '17-'18.

4            MR. ASHANTI:  '17-'18, correct.

5            Because it is decided school year by school year, that

6    is the current status of the '19-'20 but the '18-'19 school

7    year has not been resolved.  It is our position that even if

8    the Department does not appeal the FOFD, the FOFD is not a

9    resolution of the issue of pendency.  It resolves the financial

10   aspect, but it is not a resolution of whether or not the

11   student was originally entitled to pendency for the '18-'19

12   school year and that that is a right that was violated by the

13   Department through its refusal to award pendency at iBrain.

14           MR. THAYER:  I don't -- I disagree.  Frankly I don't

15   quite understand.  The pendency -- the program that it sounds

16   like the IHO in this case and in this order that Mr. Ashanti

17   has just referenced is drawing comparisons between an

18   unappealed findings of fact and decision and the iBrain

19   placement.  So I struggle to see how another finding -- an

20   unappealed findings of fact and decision would not have any

21   bearing on pendency, which is what I take Mr. Ashanti to be

22   saying.  In any event, I think we're talking in hypotheticals

23   right here.

24           THE COURT:  I think I get what you are saying.  When

25   will you be able to send me a joint letter about whether you

J9C6MENC

1    are going to appeal or not?  Included in that if you have

2    differing views of what the impact of that is, put it all in

3    the same letter.

4            MR. ASHANTI:  Your Honor, I think we've discussed it

5    and I believe we're in agreement that September 25th would be a

6    good date for the parties to be able to provide such a status

7    report to the Court -- a joint status report on that issue, but

8    the import of whatever the Department decides would be best

9    resolved through motion practice because either way the

10   Department would be seeking to -- with summary judgment.

11   Either way the plaintiffs would be seeking summary judgment.

12   So I think it makes more sense, at least the parties have

13   discussed, that in that joint status report there would be two

14   main components.  One, to inform the Court as to whether or not

15   the Department has appealed; and two, a proposed briefing

16   schedule that incorporates the fact that the Department has

17   either appealed or not appealed.

18           THE COURT:  Wait.  I am not sure I understand.  I

19   thought I understood it at the beginning, but I believe

20   Mr. Thayer said if the Department does not appeal, then the

21   pendency is, what, retroactive or something?

22           MR. THAYER:  The pendency is not retroactive, but they

23   would essentially get tuition reimbursement under the classic

24   IDEA scenario.

25           MR. ASHANTI:  Which is not pendency.  So financially

J9C6MENC

1    there would be funding to the parent, but it would not be under

2    the rubric of pendency.  The issue regarding the rights of the

3    student concerning pendency would not have been resolved.

4            So obviously the Department -- I mean, the parents

5    would be in a more favorable position with an unappealed

6    decision saying that iBrain is an appropriate placement for the

7    student if the Department does not appeal.  Again, it is not as

8    though the Department would then acknowledge, well, we were

9    wrong all along.

10           THE COURT:  I don't know if that is what the purpose

11   of summary judgment is.  If there is no continuing controversy,

12   it is not clear to me.  This is an academic question, an exam

13   question.  If there is no problem in terms of what the parent

14   is getting, it's not clear to me.  What you are seeking is a

15   court definition that private to private transfer unilaterally

16   is the same thing, deserves pendency.

17           Is that an accurate statement?

18           MR. ASHANTI:  Yes, your Honor.  It is a year-to-year

19   determination.  If there is financing, funding but no such

20   determination that would mean that the rights of the student

21   with respect to pendency of the '18-'19 school year were not

22   resolved.

23           THE COURT:  Why do they have to be resolved if money

24   gets sent to the parent or the school and going forward that is

25   going to be what happens?  Unless they switch schools, brick

J9C6MENC

1   and mortar again.

2           MR. ASHANTI:  Well, that wouldn't happen for purposes

3   of the action before your Honor.

4           THE COURT:  That is what I am not going to deal with

5   if it is not going to happen.

6           What I am trying to say is that we narrowly deal with

7   an actual controversy before us.  What you are saying is that

8   if in the Department of Education does not appeal, we want

9   there to be case law that says no matter where you take the

10  child -- I don't know even if we get to the substantially

11  similar -- if you move the child from one school physically to

12  another school physically that is the same school for purposes

13  or program for purposes of pendency.  That's what you want;

14  right?

15          MR. ASHANTI:  That is what the plaintiff is seeking,

16  yes.

17          THE COURT:  I am saying depending on how this gets

18  resolved, it is not clear to me that there is still a

19  controversy before me that I should be dealing with.  Let's get

20  to that later.  When you send me the letter, you can make your

21  argument before that.

22          MR. ASHANTI:  Fair enough, your Honor.

23          THE COURT:  Thank you for your elucidation of the

24  issues before the Court.

25          I am ordering this record on a daily basis.  Please

J9C6MENC

1    see Jennifer to fill out the form.

2              I anxiously await the September 25th submission from

3    you.

4              Have a good day.

5              MR. ASHANTI:  Thank you, your Honor.

6              MR. THAYER:  Thank you, your Honor.

7                                  o0o